UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

DAVID WEISS,                                    :

                          Plaintiff,            :          CIVIL ACTION NO.
                                                          06 Civ. 4402 (DLC)

           - against -                          :          **DEFENDANT'S STATEMENT
                                                          PURSUANT TO LOCAL CIVIL**
JP MORGAN CHASE & COMPANY,                       :          **RULE 56.1(a)**

                          Defendant.            :
-------------------------------------------------------------X

         Defendant JPMorgan Securities, Inc. ("JPMorgan" or "Defendant"), erroneously named

herein JPMorgan Chase & Company, by its attorneys, the JPMorgan Chase Legal Department,

hereby file pursuant to Local Civil Rule 56.1(a) of the United States District Court for the

Southern District of New York this statement of material facts to which Defendant contends

there is no genuine issues to be tried and by virtue of which Defendant is entitled to summary

judgment in its favor.[1]

---

[1]    In addition to the Rule 56.1(a) Statement of Material Facts, Defendant submits the Affidavit of Stephanie E. Sowell, executed August 24, 2007 ("Sowell Aff.") and exhibits thereto including: (a) excerpts from the first deposition upon oral examination of Bryan Weadock taken on January 4, 2007 ("Weadock Tr."); (b) excerpts from the second deposition upon oral examination of Bryan Weadock takent on June 12, 2007 ("Weadock 2nd Tr."); (c) excerpts from the deposition upon oral examination of Anthony McCann ("McCann Tr.") taken on January 12, 2005;. (d) excerpts from the deposition upon oral examination of Carlos Hernandez. ("Hernandez Tr.") taken on January 12 , 2007; (e) excerpts from the deposition upon oral examination of Penelope Van Niel ("Van Niel Tr.") taken on March 15, 2007 and relevant exhibits identified at Van Niel's deposition ("Van Niel Tr."); (f) excerpts from the deposition upon oral examination of Josh Neren ("Neren Tr.") taken on March 15, 2007; (g) excerpts from the deposition upon oral examination of Gene Pagnozzi ("Pagnozzi Tr.") taken on March 16, 2007; (h) excerpts from the deposition upon oral examination of Brian Charters ("Charters Tr.") taken on March 16, 2007; (i) excerpts from the deposition upon oral examination of Edward Dugan ("Dugan Tr.") taken on March 15, 2007; (j) excerpts from the deposition upon oral examination of James Lee ("Lee Tr.") taken on April 20, 2007; (k) excerpts from the deposition upon oral examination of Jeff Flug ("Flug Tr.") taken on June 5, 2007 and relevant exhibits thereto; relevant exhibits (l), (m) and (o); (n) the affidavit of Audrey Brahms and accompanying exhibits thereto; (p)

## THE PARTIES

1.     Plaintiff David Weiss, ("Weiss" or "Plaintiff") was born on August 21, 1947.  (Pl. Tr. 11).

2.     Defendant JPMorgan, a subsidiary of JPMorgan Chase Bank, N.A., a global business which has a principal place of business located at 270 Park Avenue, New York, New York. (Defendant's Answer to Complaint ("Answer") ¶ 9), (Sowell Aff. ¶ 19, Sowell Aff. Exh. Q, Copy of Weiss payroll record).

## PLAINTIFF'S BACKGROUND AND EMPLOYMENT HISTORY

3.     Plaintiff graduated from the New York State University College at New Paltz in 1968 with a bachelor degree in history and education.  (Pl. Tr. 12-13).

4.     Plaintiff was employed as a teacher for grades six to eight by the New York City Board of Education from 1968 through 1973. (Pl. Tr. 18-19).

5.     Plaintiff worked as a textiles salesman for Burlington Industries from approximately 1973 to 1976. (Pl. Tr. 19-21).

6.     Plaintiff was employed as a salesman and then a marketing manager for Westpoint Pepperell, a textiles company which sells fabrics for apparel from 1976 through 1985. (Pl. Tr. 22-23, 25).

7.     Plaintiff entered the financial services industry in 1985 when he joined Drexel Burnham Lambert ("DBL") as a salesman in fixed income. (Pl. Tr. 26-27).

8.     In 1989, Plaintiff joined DBL's high yield private placement group. (Pl. Tr. 30).

---

excerpts from the deposition upon oral examination of Plaintiff David Weiss and (q) relevant exhibits identified at Plaintiff's deposition.

9.      In June 1990, following DBL's bankruptcy, Weiss accepted employment as a vice-president in Merrill Lynch's private placement sales area. (Pl. Tr. 32).

10.     In May 1991, Plaintiff (then age 43) accepted employment as a Vice-President in private placement with Manufacturer's Hanover, a predecessor organization of JPMorgan.[2] (Pl. Tr. 11, 35, 38-39, 42, 51; Weadock Tr. 16).

11.     In or about 1993, Defendant started a high yield (HY) bond business which included banking, sales, trading and research. (Pl. Tr. 37).

12.     The difference between HY bonds and high grade bonds is a function of credit ratings.  HY encompasses bonds that are rated below triple B minus and high grade encompasses bonds that are rated triple B minus or higher. (Pl. Tr. 36).

13.     Plaintiff worked exclusively in the HY bond sales area beginning in or about 1993. (Pl. Tr. 38-39).

14.     In or about 1992 or 1993, Weiss (at approximately age 45) was promoted to Managing Director. (Pl. Tr. 11, 40).

15.     In 1998, Weiss (at approximately age 51) became head of Defendant's HY sales group reporting to Peter Schmidt-Fellner, who was responsible for HY sales, trading and research.  (Pl. Tr. 11, 41-42).

16.     In or about fall 2000, Weiss began dual reporting to Schmidt-Fellner and Jeff Flug, the national sales manager for all of fixed income. Schmidt-Fellner handled most of the managerial responsibilities with respect to Weiss. (Pl. Tr. 41, Flug Tr. 7-8)

---

[2]     Defendant has had several mergers since 1991.  Plaintiff's employer Manufacturer's Hanover merged with Chemical Bank to form Chemical Bank ("Chemical") in or about January 1992. Thereafter, in January 1996, Chemical merged with Chase Manhattan Bank to form Chase Manhattan ("Chase").  Later, in January 2001, Chase merged with JPMorgan.  (Pl. Tr. 11, 35, 38-39, 42, 51; Hernandez Tr. 116).

17.     From approximately fall 2000 to fall 2004 every product sales manager (including HY) reported to the business product unit head (in Plaintiff's case Schmidt-Fellner in 2002/2003; Jonathan Gray 2003 to late 2004) and had a joint reporting responsibility to Flug. (Flug Tr. 7-10; Pl. Tr. 45-47)

18.     The theory for the dual reporting lines was that from a product standpoint the business unit head could set the agenda for their part of the organization and discuss how to promote their product whereas the national sales manager (i-e. Flug) focused more on clients and the promotion of various financial products. (Flug Tr. 8; Pl. Tr. 289-290).

19. ·    In late 2002/early 2003, Weiss was advised by Schmidt-Fellner and Flug to give up his accounts and just manage HY sales. (Pl. Tr. 44 - 45).

20.     In early 2003, Schmidt-Fellner left JPMorgan and Gray, who assumed Schmidt-Fellner's responsibilities, became Weiss' direct manager with respect to HY product. (Pl. Tr. 45 –47).

21.     Gray had primary supervisory responsibility and daily interaction with Weiss when Weiss dual reported to Flug and Gray. (Flug Tr. 10, 38).

**FALL 2004 REORGANIZATION**

22.     In fall 2004 JPMorgan reorganized NACM to align sales trading and organization among functional lines. (Van Niel Tr. 19-20; Flug Tr. 112; Weadock Tr. 53)

23.     In or about November 2004, as part of the numerous the organizational changes in the reporting structure Flug promoted Weadock (born December 14, 1962) to head of all credit sales, which included HY, high grade, credit derivatives and municipal sales. (Pl. Tr. 47, Flug. Tr. 112-13; Weadock Tr. 34).

24.     The purpose of the fall 2004 reorganization was to assign similar functions across different product groups – i.e. bring trading groups in different products or sales groups under different products under shared leadership by a particular function (i.e. sales). (Van Niel Tr. 49).

25.     The fall 2004 restructuring was done in part to address the poor performance of the North American Credit Markets ("NACM") business during 2004.   As part of the restructuring John Steinhardt was removed from the head of NACM. (Hernandez Tr. 15).

26.     Prior to his selection as head of credit sales in November 2004, Weadock had been head of high grade and a direct peer to Weiss and, like Weiss, previously reported to Gray and Flug. (Pl. Tr. 47).

27.     Following Weadock's selection as head of credit sales, Weiss was assigned to directly report to Weadock. (Pl. Tr. 47).

28.     As a result of the reporting structure change, Weiss no longer had a dual reporting relationship to the business unit and solely reported to Flug's sales management area.  (Flug Tr. 112-113).

29.     Weiss did continue to report to Gray performance year 2004 until the end of 2004 for bonus allocations and his year end performance, but in December 2004 Gray was reassigned to another position in the firm. (Pl. Tr. 47-48).

30.     At the end of 2004,  as part of the NACM reorganization, HY salespeople Michael Cherry and Jeff Warren (both Managing Directors) were selected for job elimination. (Pl. Tr. 94-95).

31.     According to Plaintiff, Cherry was terminated because he was not performing according to his expected abilities. (Pl. Tr. 98, 206-07).

32.     According to Plaintiff, Warren was terminated because his performance was

deteriorating. (Pl. Tr. 101).

33.     No one was hired to replace Warren and Cherry. (Pl. Tr. 94-95, 101; Pl. Tr. 101)

34.     In discussions with Warren and Cherry regarding their termination, Weiss only told them that "there was a position elimination" and Weiss gave them no other reasons for their termination." (Pl. Tr. 102).

35.     Flug took a sabbatical from the firm from early February 2005 to September 2005 and Weadock began reporting to Carlos Hernandez. (Pl. Tr. 45; Flug Tr. 36)

## BONUS COMPENSATION PROCESS

36.     Bonus compensation at JPMorgan is an iterative process, starting with the top executives deciding upon a firm wide bonus pool based on profitability, costs and revenues and then allocating how much the various JPMorgan lines of businesses (including investment banking) would receive.  (Flug Tr. 48-49; Weadock Tr. 46).

37.     Plaintiff's line of business, investment banking would then parse its overall number to different divisions and the bonus numbers are continually parsed down within the different business product, units and sales groups. (Flug Tr. 48-49, 56; Weadock Tr. 46).

38.     Weiss was a part of the North America Credit Markets ("NACM') division, which during 2003 to fall 2004 was headed by John Steinhardt. (Flug Tr. 56 – 58; Hernandez Tr. 103-105).

39.     Steinhardt would allocate the bonus pool funds to his various business unit heads (such as Weiss' manager Jon Gray) within NACM. (Flug Tr. 56 – 58).

40.     Gray would then allocate pool monies to his direct reports (such as Plaintiff and his then high grade sales peer, Bryan Weadock) and they would be responsible for determining

how to allocate bonus compensation funds among their direct reports. (Pl. Tr. 289-290; Weadock Tr. 46, Flug Tr. 57).

41.    Gray also worked with Flug on the overall bonus allocations to HY and high grade sales because Gray was responsible for both the HY and high grade business products and Flug had responsibility for all sales groups across the firm. (Pl. Tr. 289-290; Flug Tr. 56-58).

42.    Weiss was responsible for determining the proper allocations of bonuses among the individual salespeople who reported to him and was also responsible for conveying to management if he thought he needed more money. (Flug Tr. 57-58; 142; Weadock Tr. 46).

43.    Flug relied on Weiss and other sales managers to determine appropriate compensation for the HY sales staff. (Flug Tr. 100).

### PERFORMANCE YEAR 2004 BONUS COMPENSATION

44.    On or about December 17, 2004 Weiss sent an email to Hernandez, Flug, Gray and Weadock stating the termination Warren and Cherry had many clients questioning JPMorgan's commitment to HY and emphasizing that HY could not afford to lose any more people. In the December 17, 2004 email Weiss stated that any additional losses in personnel at the senior sales person levels would be "potentially disastrous" and that there was a high degree of risk if the bonus pool was not increased for HY sales. (Flug Tr. 110; Flug Tr. Exhibit 32).

45.    In his December 17, 2004 email Weiss requested a total bonus need for HY sales people of $12.475 million. (Flug Tr. 110; Flug Tr. Exhibit 32).[3]

---

[3]    This figure included 1.2 million for job eliminees Warren and Cherry. (Flug Tr. Exhibit 32).

46.     As of January 6, 2004, JPMorgan approved approximately $11.7 million in bonus compensation for the HR salespeople mentioned in Weiss' December 6, 2004 email (i.e. nearly 94% of the amount requested). (Flug Tr. Exhibit 34).

47.     Thereafter on January 11, 2004, Gray approved an additional $100,000 for two individuals in Weiss' group, bringing the total to approximately $11.8 million to the $12.475 million December bonus increase requested. (Flug Tr. 115, Exhibit 35).

48.     Despite November 2004 directives that the overall NACM bonus pool could be down as much as 30%, as of January 6, 2005 Weiss's HY sales team was only down by 5.1% over the prior year. (Flug Tr. 115, Exhibit 34).

49.     A peer group, high grade sales, which had been headed by Weadock had its pool cut by 18.5%. (Flug Tr. 115, Exhibit 34).

50.     Weadock had candid conversations with his people asking what they expected to get paid so that they were not surprised when bonus compensation came out. (Weadock 2nd Tr. 59).

51.     Weadock believed Weiss had difficulty communicating with his team about what to expect with respect to compensation (Weadock 2nd Tr. 59).

52.     Weiss was responsible for informing Cherry and Warren that their positions were being terminated. (Pl. Tr. 102).


CONCERNS EXPRESSED TO FLUG

53.     On or about November 4, 2004, one of the Weiss direct reports, Michael Cherry had a meeting with Flug to discuss his concern about his compensation, his thoughts on the market compensation and to make sure Flug relied on other sources outside of Weiss for market

data because he felt Weiss did not have the "complete picture" or have "his pulse on the marketplace". (Flug Tr. 91-92; Flug Tr. Exhibit 21).

54.    On or about November 10, 2004, Flug had a meeting with Weiss' direct reports Edward Dugan ("Dugan"), Shabbir Jasdanwala ("Jasdanwala") and possibly Cherry during which they went into "painstaking detail" with Flug about the marketplace for top people in HY and expressed concern that Weiss did not fully understand or appreciate the market and expressed to Flug they wanted to make sure they got another person in the process. (Flug Tr. 97 – 99; Flug Tr. Exhibit 23).

55.    Between November 18 and 19, 2004 another of Weiss' direct reports, Anthony McCann, sent email communications to Flug trying to arrange a meeting with him. (Flug Tr. Exhibit 27).

56.    On or about November 24, 2004, another of Weiss's direct reports Jeff Warren ("Warren") met with Flug to discuss with Flug what top salespeople in HY at other firms were getting in compensation. (Flug Tr. 105-106; Flug Tr. Exhibit 28).

57.    Flug's impression was that the HY salespeople that met with him were concerned that Weiss was not aware of the "pulse" of the marketplace. (Flug Tr. 106).

### THE HY SALES GROUP CONCERNS

#### JOSH NEREN

58.    Josh Neren, was hired by Weiss as a HY salesperson from the Royal Bank of Canada in 2002.  (Neren Tr. 19-20).

59.    Neren did not feel that Weiss gave him a good account list when he first started with JPMorgan. (Neren Tr. 26).

60.     In January 2003, Neren was paid the minimum incentive compensation he was offered as part of his job offer. (Neren Tr. 25).

61.     Neren was very disappointed with only being paid the minimum incentive compensation for performance year 2002 and thought he would have been paid more based on his production. (Neren Tr. 25-26).

62.     During the following performance year 2003, Neren felt he was paid very low in comparison to what other people on Wall Street were paid in HY sales area. (Neren Tr. 25-26).

63.     Neren spoke with Weiss' managers Flug and Gray about his disappointment with his bonus for performance year 2003. (Neren Tr 72-73).

64.     Neren states when he spoke with that Flug, Flug informed him that Weiss "had the opportunity to get us all paid." (Neren Tr. 73).

65.     Neren states that Flug told him that he was very surprised that Neren was disappointed and had told Weiss to make sure that he was happy with the numbers and comfortable. (Neren Tr.73-74).

66.     Neren was very disappointed with his compensation for performance year 2003, because he thought he had a verbal agreement with Weiss for a higher number (Neren Tr. 48).

67.     As of October 2004, Neren's concern with Weiss as a manager was that he thought that the compensation obtained by Weiss for him had been inappropriate for performance years 2002 and 2003. (Neren Tr. 42-43).

68.     As of October 2004, Neren was ranked an "E" in HY sales, which was the top of the group. (Neren Tr. 43-44).

69.     Neren felt that that he was mispaid for performance year 2003, and Weiss's failure to compensate him properly in 2003, compounded the problem in 2004 when bonuses

were down firm wide. (Neren Tr. 55–56).

70.    In January 2005, during the HY sales conference in Miami, Florida Neren spoke with clients about his dissatisfaction with compensation and the fact he was thinking about and looking elsewhere for employment. (Neren Tr. 47-48).

71.    In January 2005, after being dissatisfied with compensation Neren interviewed for external positions with Oman Brothers, Goldman Sachs and Deutsche Bank and Bank of America after receiving his performance year 2004 compensation in January 2005.  (Neren Tr. 65-67).

72.    Other areas of concern for Neren with respect to whether Weiss was able to advocate for the group within the trading floor. (Neren Tr. 57-58).

73.    In Neren's view Weiss and Weadock did not get along and he was concerned that because of this HY sales' profile was not high enough  and as a result it would hinder the HY group. (Neren Tr. 58).

74.     Neren sat down and spoke with Weiss regarding his concerns about Weiss' advocacy of the group. (Neren Tr. 58).

75.    During 2004 Neren participated in a conference room meeting with Weiss, and other sales people including Cherry and Jasdanwala in which they specifically discussed their concerns with Weiss' advocacy of the group and its achievements. (Neren Tr. 58-59).

76.    After Weadock became Weiss' manager, Neren spoke with Weadock and opined that "things could be done better" with respect to management of the group. (Neren Tr.61).

77.    Neren felt HY salespeople were upset and disappointed with the December 2004 firing of Jeff Warren and Mike Cherry because in their view neither Cherry or Warren were not told their performance was a problem, were not told they needed to look for other jobs were not

allowed to "graciously exit." (Neren Tr. 13- 14).

78.     Neren does think that others on the HY team advocated for Weiss to be fired and recalls that members of the team were very upset and disgruntled about (1) the firings of Mike Cherry and Jeff Warren, (2) the level of compensation and (3) the perception that they were the "third wheel" to HY trading and capital markets (Neren Tr. 62 – 63).

79.     In early 2005, Weadock was the first person to speak with Neren about giving him a guarantee to stay with the firm. (Neren Tr. 68).

80.     Neren states that Scott Donahue, who left the firm in 2005 voiced to Neren continued displeasure with his compensation. (Neren Tr. 65),

81.     Neren stopped interviewing when he was guaranteed a bonus by Weiss and Weadock. (Neren Tr. 68).

BRIAN CHARTERS

82.     HY salesperson, Brian Charters was disappointed with his bonus compensation for performance year 2002, which was down 25 to 30 percent down from his prior year bonus compensation. (Charters Tr. 15-16).

83.     For performance year 2003, Charters hoped to be compensated at market level, for someone of his years of experience and production. (Charters Tr. 18).

84.     Charters' believed his market compensation should be at least $ 1 million dollars. (Charters Tr. 19).

85.     Charters attributed his $ 1 million market value to good client relationships, a good working relationship with capital markets and having the right tool set to be successful in HY. (Charters Tr. 22).

86.     For performance year 2003, various individuals at competitor banks indicated to

Charters that his market value was around one million dollars. (Charters Tr. 24).

87.     Although Charters has a good relationship with capital markets multiple times other sales people, including Jasdanwala and Cherry expressed concern to him that [HY] capital markets was too "strong" and expressed frustration that HY sales did not have enough of a voice in the pricing and underwriting process. (Charters Tr. 27-28).

88.     For performance year 2003, Charters received total compensation in the amount of $850,000. (Charters Tr. 36).

89.     Charters believed that Weiss declined a larger bonus pool for HY sales to look good to senior management. (Charters Tr. 64).

90.     Charters felt that the decision to remove Weiss was made for the benefit of the salespeople who had expressed past disgruntlement, unhappiness and frustration.  (Charters Tr. 76).

91.     Charters observed that Weiss was sometimes abrasive with clients and recalls one client complaining that Weiss did not acknowledge her at conferences.  (Charters 78 – 79).

92.     During a February train ride with Weadock, Charters informed Weadock that that with respect to clients there were a lot of people" that Weiss had "rubbed the wrong way." (Charters Tr. 79).

93.     In Weiss' 2004 feedback report, Gray observed that Weiss needed to "fight even harder for the sales team, be it with compensation or promotions." (Pl. Tr. 277, Pl. Tr. Exhibit DD).

94.     In 2004, Weadock asked Charters about his opinion of the HY sales force. (Charters Tr. 70).

95.     Charters' felt it was public knowledge that HY was frustrated with compensation.

(Charters Tr. 55).

96.     The sales force was unhappy with compensation and the imbalance of power between HY, trading and capital markets. (Charters Tr. 55).

97.     Around late 2004, Charters expressed his frustration with his compensation to Weadock. (Charters Tr. 56).

98.     Charters recalls having a conversation with Weadock late 2004 in which Weadock asked him about how things were going in HY sales and the overall sentiment of the team and Charters told to Weadock that there was "disruption going on with the sales force." (Charters Tr. 53-56).

99.     Charters remembers specifically four or five guys including Cherry, Dugan and Jasdanwala going to management to report that were not happy about multiple things "like compensation and that [HY sales] was not being recognized for being a very respected sales force by clients, that trading had to much power and capital markets was to pushy." (Charters Tr. 545-55).

100.     Charters reported to Weadock he was frustrated with compensation and that it had been challenging as a whole for the team over the past years.  (Charters Tr. 56-57).

101.     Charters also expressed frustration to Weadock regarding his account base. (Charters 58).

102.     Following the decision to place McCann as head of the group, Charters separately told each Hernandez and Weadock that he was impressed with the decision to remove Weiss, that the "gutsy" move and that he thought it evidence that management really cares about the troops.  (Charters Tr. 76).

GENE PAGNOZZI

103.     In early 2003, Pagnozzi felt that he was producing on par with the rest of the sales forces but only getting paid at the level of a sales assistant. (Pagnozzi Tr. 14).

104.     In or about early 2003, after receiving his performance year 2002 incentive compensation in the amount of $200,000, Pagnozzi was disappointed with the direction of the group and his compensation and pursued a job with Lehman. (Pagnozzi Tr. 12).

105.     Pagnozzi received a job offer from Lehman with a guaranteed minimum bonus $500,000 higher than the bonus he received from JPMorgan for performance year 2002 compensation). (Pagnozzi Tr. 13).

106.     In 2003, Pagnozzi announced his intention  to resign and thereafter several JPMorgan managers sat down to discuss the matter and made a verbal commitment to Pagnozzi to match Lehman's guarantee for performance year 2003. (Pagnozzi Tr. 12).

107.     At the end of performance year 2003, although Pagnozzi received more than his guarantee he still felt he was under compensated for performance year 2003 by about $500,000 based on his sales production in comparison to others on the desk. (Pagnozzi Tr. 19).

108.     Pagnozzi states that he believe others that he was producing on par with were making more than him based on comments by Weiss that "it was very difficult to pay someone down who makes $2 million because they have a big home and big mortgage and all those things to take care of." (Pagnozzi Tr. 20).

109.     Pagnozzi's opinion regarding the appropriate level of market compensation for him was based on conversations he had with colleagues at other firms including Deutsche Bank and Citibank. (Pagnozzi Tr. 23).

110.   Pagnozzi recalls one year the HY sales group was very disappointed with compensation, yet the high grade team was pleased with their compensation. (Pagnozzi Tr. 27).

111.   Pagnozzi stated that the rumor among his team and opinion of the group was that Weiss gave money back to the compensation committee because he thought he could get away with paying his people less. (Pagnozzi Tr. 28).

112.   Pagnozzi states that since Weiss' removal as head of HY sales he feels he is in a more fair environment with respect to compensation. (Pagnozzi Tr. 36).

113.   In January 2005, following his receipt of his performance year bonus compensation, Pagnozzi once interviewed for external job positions.  (Pagnozzi Tr. 42).

114.   In or about early 2005, Pagnozzi received a minimum bonus guarantee from Lehman Brothers. (Pagnozzi Tr. 42).

115.   Thereafter, in or about February 2005, JPMorgan got wind of Pagnozzi's plans to exit and made him a written bonus guarantee. (Pagnozzi Tr. 43).

116.   As of February 2005, Pagnozzi's opinion was that as a manager, Weiss had not done a good job integrating the HY sales team into the credit platform and getting the sales force recognized. (Pagnozzi Tr. 26, 27).

117.   After Shabbir Jasdanwala left and Pagnozzi "[came] to the realization" that Boege, Wade, Charters and he all considered leaving, he told Weadock that he thought that control of the group was lost and that there were many disgruntled people about to leave. (Pagnozzi Tr. 45).

118.   Although Pagnozzi felt that Weiss rolled over and let capital markets price deals wherever they wanted thereby letting the interest of the issue outweigh the interest of the investor.  (Pagnozzi Tr. 55).

119.    Pagnozzi thought that Weiss could have done a better job of "making sure that his people were being compensated for the[ir] time and effort." (Pagnozzi Tr. 27).

120.    Although Pagnozzi felt that Weiss possessed many leadership skills, he thought Weiss led the group with fear and intimidation. (Pagnozzi Tr. 48).

121.    Pagnozzi states that incorrect pricing on deals effects compensation because if the HY sell desk had to sales and support a deal that was trading down and not placed at a proper level, the HY sales deals made less money and as a result were compensated less. (Pagnozzi Tr. 57).

122.    Pagnozzi also felt that Weiss inappropriately allowed the trading desk to blame trading losses on the HY sales area. (Pagnozzi Tr. 46).

123.    In Pagnozzi's opinion and the opinion among the sales force was the reason Weiss was removed as head of the HY group was because the sales force was disgruntled and management did not think Weiss was the person that could champion the cause. (Pagnozzi Tr. 5 - 6).

124.    Pagnozzi thought that if you did 100 things for Weiss and did one thing wrong Weiss would focus on the one thing you did wrong and not praise the 99 things done right. (Pagnozzi Tr. 11).

125.    Pagnozzi would have like Weiss to have recognized, rather than him down played his successes as a salesperson more. (Pagnozzi Tr. 11).

126.    After Jaswandala resigned, Pagnozzi felt that HY salespeople Christopher, Peter, Boege and Peter Wade were also going to resign. (Pagnozzi Tr. 45).


ED DUGAN

127. Dugan first thought about leaving the firm in late 2004/early 2005. (Dugan Tr. 34).

128. Dugan spoke with Weiss and others about Weiss' failure to promote him to Managing Director during the years Weiss was head of HY sales. (Dugan Tr. 21).

129. Dugan states that for performance years 1999, 2000, 2001 and 2002 he was one of the top three salespeople on the team but was paid like the sixth or seventh sales person. (Dugan Tr. 31) and that during these period Weiss told him that his bonus compensation was not all about sales credit. (Dugan Tr. 32).

130. In his 2003 360 feedback review for Weiss, Dugan stated that Weiss "needs to get sales a great deal of money for 2003 compensation." (Dugan Tr. 72).

131. Dugan states that during a meeting with Flug, in or about 2004 Flug expressed frustration about HY salespeople's complaints about bonus prior year's compensation and informed him, Cherry and Jasdanwala that there "was more money available and [Weiss] did not take it." (Dugan Tr. 48).

132. On January 20, 2005, following his receipt of his bonus compensation for performance year 2004, Dugan decided that he would seek employment elsewhere. (Dugan Tr. 53).

133. Dugan states that everyone he spoke to expressed disappointment regarding their compensation for performance year 2004. (Dugan Tr. 54).

134. Early 2005, after receiving what he considered to be a low bonus, Dugan discussed job opportunities with Goldman Sachs, Deustche Bank and Bank of American (Dugan Tr. 56).

135.   To Dugan's knowledge at least five salespeople on the HY sales team were interviewing for external jobs in early 2005. (Dugan Tr. 58).

136.   In or about late 2004 or early 2005, Weadock asked Dugan to come to his office to talk about the mood of the HY sales people and Dugan told him that it was "dismal" and that there were a risk of losing a lot of people and "the machine was already in process." (Dugan Tr. 66).

137.   In or about March 2005, Weiss called Dugan into a conference room and asked him if he would stop interviewing if he could get him comfortable about next year's compensation. (Dugan Tr. 59).

138.   Weiss was removed as head of HY sales prior to Dugan receiving any bonus guarantee for performance year 2005. (Dugan Tr. 59).

139.   Dugan felt that Weiss would roll over too often with other product groups without championing or defending the sales team. (Dugan Tr. 75).

140.   According to Dugan, he and approximately three other top HY salespersons (including Cherry and Jasdanwala) met with Weiss in a conference in August or September 2004 to express concern about (1) compensation (2) representation and appearance of HY to other groups within the firm and (3) the feeling that there was no leadership in the group. (Dugan Tr. 89). Dugan states that during his meeting Cherry told Weiss he was losing faith in his confidence in leading the group. (Dugan Tr. 89).

141.   In the 2004 feedback report for Weiss, Dugan stated that Weiss needed to make sure "the best sales desk on wall street is treated as such." (Pl. Tr. Exhibit DD).

142.   In the 2004 feedback report Dugan also stated that he thought Weiss needed to deflect the demands of administrative and other departments. (Pl. Tr. Exhibit DD).

143.    After receiving what Dugan thought was another low bonus, Dugan decided to seek employment elsewhere. (Dugan Tr. 52-53).

144.    In Dugan's opinion, Brian Tramantozzi's promotion to Managing Director (MD) in capital markets, highlighted to him that the people Tramantozzi worked for were willing to fight for him, and that Weiss was not. (Dugan Tr. 26-27).

145.    Following McCann's promotion to head HY sales, Dugan talked with McCann and Weadock and got a bonus guarantee for performance year 2005 and decided to stay with JPMorgan. (Dugan Tr. 59).

146.    Dugan felt that "it was Weiss' fault that the HY sales group was not paid "market compensation." (Dugan Tr. 46).

147.    Following the announcement that McCann would be head of HY sales in March 2005, Dugan was relieved feeling that with McCann in place people who were interviewing would stay and the team "would not be dismantled." (Dugan Tr. 98).

148.    Dugan thought that people on the team felt that McCann was a real good choice for head of HY sales. (Dugan Tr. 98).

149.    In a meeting with Weiss after Weiss's termination, Dugan told Weiss that three things went wrong with the HY group: (1) they were under-compensated by 30 to 40 percent; (2) the best salesman Jasdanwala was permitted to leave; and (3) there were no Managing Director recommendations made between 1995 to 2005. (Pl. Tr. 267).

ANTHONY MCCANN

150.    At least once a year, McCann told Weiss that he wanted to be paid more. (McCann Tr. 45, 54).

151.    For practically ever year, he worked under Weiss, McCann was dissatisfied with

his compensation.  On occasion in May 2004 in frustration with Weiss' management, McCann talked about slowing down performance and coming in late.  (McCann Tr. 116) (McCann Tr. 53).


SHABBIR JASDANWALA

152.    At the end of 2003, Jasdanwala was the highest ranking salesperson in HY and considered the best salesperson on the team. (Dugan Tr. 35; Pagnozzi Tr. 33).

153.    Jasdanwala stated in fall 2004 360 feedback report that Weiss needed to fight harder for the sales team on issues of compensation and promotions as well as when capital markets tries to push HY around. (Pl. Tr. Exhibit DD, JPMC 2004 Feedback p. 7).

154.    Jasdanwala  expressed to management that he felt the HY sales group was underpaid. (Weadock Tr. 64, Flug Tr. 98).

155.    By the beginning of March 2005, management  learned that Jasdanwala was close to accepting an offer from Lehman Brothers. (Pl. Tr. 175-176).

156.    When Weadock discussed his planned resignation, Jasdanwala told Weadock that he did not feel the HY business was doing a good job of delivering "the firm" to the client. (Weadock Tr. 59-60).

157.    After Jasdanwala announced his intention to leave the firm, the firm had him (1) meet with the head of the firm, Jamie Dimon; (2) meet with the co-head of Investment Banking, Steven Black; (3) meet with Weadock's boss Hernandez; (4) talk with him about making him a managing director; and (5) making him a guarantee of $3 million for his next performance year. (Weadock Tr. 70-73).

158.   Jasdanwala turned down an offer to co-head HY with Weiss. (Weadock Tr. 71-72).

159.   Despite JPMorgan's efforts to retain him Jasdanwala left the firm effective March 8, 2005. (Weadock, Tr. 77-80).

160.   Jasdanwala told McCann he left JPMorgan due to imbalance of power with capital markets and traders, being under respected for collective work, the inability to be seen as an equal or senior in the group, and compensation. (McCann Tr. 71).

161.   During the summer of 2004, Jasdanwala, along with Dugan and Cherry, collectively approached and met with Weiss to tell him they felt they were underpaid and that Weiss was not advocating enough for them. (Pl. Tr. 264; Dugan Tr. 89).

## HY SALES PERSONS COMMUNICATIONS WITH WEISS

162.   Weiss admits that Neren was very upset with is compensation for performance 2003. (Pl. Tr. 264).

163.   Weiss admits Jasdanwala was upset with his compensation for performance year 2003. (Pl. Tr. 263).

164.   Weiss admits Cherry was disappointed with his compensation every year in HY sales, including 2003. (Pl. Tr. 263).

165.   Weiss admits that he had "more than one discussion with in which the HY sales team voiced concerns about compensation, including 2003 in which they informed Weiss that they felt they were underpaid. (Pl. Tr. Exh. 263-264).

166.   Weiss in his development needs for 2004 stated he needed to "Convince sales I am their "advocate". (Pl. Tr. Exhibit EE)

167.   Weiss concedes the team members Dugan, Jasdanwala, Cherry, Warren and

Neren all told him that they felt he was not pulling his weight with getting them paid and that he was letting other groups run over HY sales. (Pl. Tr. 265).

168.    Weiss admits that the HY sales team felt they were overworked and underpaid and attributed it to him.  (Pl. Tr. 217).

169.    Weiss admits HY salespeople expressed concerns to him that he did not take their side with respect to trading and research.  (Pl. Tr. 281-220).

## WEISS' 2004 FEEDBACK REPORT

170.    In Weiss' 2004 360 report HY salesperson, Peter Wade stated that Weiss "lack[ed] leadership skills…" (Pl.  Tr. Exhibit DD).

171.    In the 2004 feedback report, Angie Long also expressed concern that Weiss' group did not seem to "rall[y] around him."

172.    In a 2004 360 feedback report, Cherry reported that Weiss needed to: 1) get the HY sales force paid at market level; 2) show support HY status internally; 3) Be less confrontational with accounts. (Pl. Tr. Exhibit DD, JPMC 2004 Feedback report p. 6).

173.    In the 2004 360 Feedback report, Donahue also reported that Weiss needed to fight harder for compensation and promotion. (Pl. Tr. Exhibit DD, JPMC 2004 p. 7).

174.    Weiss was also told in his feedback that he needed to be "less antagonistic" with clients. (Pl. Tr. 279, Pl. Tr. Exhibit DD).

175.    Weiss' manager, Gray commented that Weiss "lack[ed] leadership skills and stated that Weiss' "negativity erodes the commitment of his troops." (Pl. Tr. 278).

## HY SALES 2005 DEFECTIONS AND THREATENED DEFECTIONS

176.   Because of the sales group's continued dissatisfaction with compensation and leadership, in early 2005, many individuals in the HY sales group began interviewing with other firms. (Pl. Tr. 204; Neren Tr. 67; Charters Tr. 70).[4]

177.   On or about March 3, 2005, HY sales person Donahue, resigned.  (McCann Tr. 99).

178.   As of March 2005, HY four sales senior salespeople had left JPMorgan, Cherry and Warren by way of job elimination and Jasdanwala and Donohue by way voluntary resignation.  (McCann Tr. 99)

179.   From January to March 2005, at least 6 top producing salespeople had received offers or were about to receive offers from competitor firms. (Neren Tr. 67; Dugan Tr. 56-58; Pagnozzi Tr. 11-12).

180.   To prevent the HY group from accepting offers at other firms, in early March 2005, Weadock and/or Weiss offered guarantees to five HY sales people, one of them Jasdanwala declined to offer.[5]

181.   On March 8, 2005, Jasdanwala, the number one salesperson in the group, resigned and accepted a position with Lehman Brothers.   (Pl. Tr. 204).

182.   McCann was the only senior salesperson that was not interviewing. (Pl. Tr. 204)

## CLIENT COVERAGE CONCERNS

---

[4] Brian Charters was approached by Deutsche Bank. (Charter Tr. 70); Ed Dugan interviewed with Goldman Sachs and Bank of America. (Dugan Tr. 60).  Neren interviewed with several firms including Oman Brothers, Goldman Sachs, Deutsche Bank and Bank of America. (Neren Tr. 67).

[5] As discussed earlier in this stmt., Pagnozzi accepted a guarantee and stayed; Jaswandala did not accept an offered

183. Weiss stopped covering accounts in late 2002 early 2003. (Pl. Tr. 44-45).

184. Shortly after he became head of credit sales, Weadock thought it was a problem that Weiss did not want to cover accounts. (Weadock Tr. 40).

185. After Weadock became his manager, Weadock believed it was problematic that Weiss spent most of his time allocating new issues to the HY sales team, instead of interfacing with client and driving the business forward. (Weadock Tr. 182- 85).

186. Weadock told Flug he thought Weiss should cover accounts because it was a better way to maximize productivity (Flug Tr. 114).

187. From November 2004 to early March 2005, the first time Weiss expressed any intention to cover accounts to Weadock was after Jasdanwala's resignation on or about March 8, 2005.

188. In Weadock's opinion, Weiss spent too much of his time allocating new issues, and as a result, did not have enough time to cover accounts. (Weadock Tr. 183, 185).

189. According to Weadock, after Jasdanwala resigned on March 8, 2005 Weiss agreed to cover accounts by putting his name on some accounts, but having a junior salesperson, Anne Knopman, actually do the work. (Weadock Tr. 151).

190. The 360 feedback report provided to Weiss in October 2004, Flug noted as a development need for Weiss that he should "increase personal efforts with priority accounts." (Flug Tr. 30 – 33, Van Niel Tr. Exhibit 13).

191. Weadock wanted producer sales managers for all his sales groups. (Van Niel Tr. 65).

### FEBRUARY 11, 2005 MEETING WITH HERNANDEZ

---

guarantee and resigned, Lehman Brothers; Brian Charters accepted a guarantee and stayed; Josh Neren accepted a

192.    In February 2005, Hernandez met with the HY sales force without Weiss present. (Hernandez Tr. 45-46).

193.    During the meeting the sales force expressed the view that HY had become the lower rung of the triangle with HY trading and HY capital markets running the HY product and this was reflected in compensation and the way the trading desk treated sales. (Pagnozzi Tr. 45-47).

194.    In Hernandez opinion, members of the HY group Jasdanwala, who received a guarantee, elected not to stay because of a lack of confidence in Weiss. (Hernandez Tr. 64-66, 76).

195.    In Hernandez's opinion Weiss' group was unhappy about more than compensation; they lacked confidence in Weiss as a boss and in defending their interests, with respect lack of promotions to managing director, and lack of advocacy for the group members. (Hernandez Tr. 45-48).

196.    Unlike the other 15 to 20 sales teams Hernandez met with HY sales was upset about compensation paid to them not only for performance year 2004, but also during the prior performance year 2003. (Hernandez Tr. 47)

### THE BASIS FOR THE DECISION TO ELIMINATE WEISS' POSITION.

197.    The HY salespeople told Weadock that they were unhappy because they were underpaid for multiple years, despite the bank doing well in certain of those years. (Weadock Tr. 134).

---

guarantee and  Ed (Pl. Tr. 200) and Donohue resigned and moved to the client side of the business.

198.    In Weadock's opinion multiple years of non-delivery on compensation, even when the year was a good year, "wore on them [HY salespeople] over time." (Weadock Tr. 134).

199.    In Weadock's opinion in 2005, HY salespeople were threatening to leave because of: 1) loss of confidence in their leader and their organization and 2) not wanting to deal with the fact that for another year they did not receive fair compensation. (Weadock Tr. 135).

200.    Hernandez thought Jasdanwala left because of his lack of confidence in Weiss and problems with compensation. (Hernandez Tr. 90).

201.    In early 2005, Weadock told Human Resources business manager Penelope Van Niel that the goal was for all managers to become producer managers and he did not feel that Weiss had moved toward that goal.  (Van Niel Tr. 65-66).

202.    The high level of discontent among HY sales staff in HY was another concern expressed to Human Resources by Weadock.  (Van Niel Tr. 66).

203.    Weadock further reported to Van Niel he felt that Weiss could have done a better job of managing the sale's groups expectations for bonuses. (Van Niel Tr. 97).

204.    In March 2005 Weiss recommended to Hernandez that Weiss be removed as head of HY sales and Hernandez agreed with the decision.  (Hernandez Tr. 89).

205.    March 9, 2006, Van Niel reported to Susan LaMonica head of Human Resources for the Investment Bank that Weadock felt it was time for Weiss to move on because he is not the "positive, energized leader that HY needs at this time." (Van Niel Tr. 102-103; Brahms Aff. ¶6; Brahms Aff. Exhibit A).

206.    Van Niel stated that among the reasons were Weiss was considered for termination were Weiss' lack of strategic leadership of the HY team, the need for increased revenues and the need for a better response to market changes. (Van Niel Tr. 16)

207.    Van Niel asked if Weiss could be treated as a job eliminee which would allow him to be able to search for an internal position and get the most generous treatment including stock highlighting that the position was being moved from a non-producing manager.  (Brahms Aff. Exhibit 1).  (Van Niel Tr. 108).

208.    LaMonica approved job elimination treatment for Weiss.  (Brahms Aff. Exhibit I)

209.    Weiss' age was not considered in the Weadock and Hernandez's decision to terminate him. (Hernandez Tr. 119; Weadock Tr. 187)

210.    In evaluating candidates for the producing manager role, Weadock considered McCann and Neren. (Weadock Tr. 188-89)

211.    In evaluating McCann and Neren for the position of producing manager, Weadock felt that he knew their contributions and attributes reasonably well. (Weadock Tr. 188).

212.    Weadock also relied on information he obtained over the prior two years by sitting in on Weiss' evaluation of McCann and Neren. (Weadock Tr. 188).

213.    Weadock selected McCann for the role. (Weadock Tr. 188).

214.    In 2005, after taking over as manager, McCann's group had higher morale and parity between itself and trading and capital markets. (McCann Tr. 85; Charters Tr. 75-76).

215.    On March 15, 2005, Weiss met with Weadock and informed him he was making a change his role as HY sales manager was being eliminated.  (Weadock Tr. 168).

216.    By having the termination classified as a job elimination, Weiss have the opportunity to rest in all of his outstanding stock under the terms of the severance plan. (Weadock Tr. 170).


**PLAINTIFF'S SUBSEQUENT EMPLOYMENT**

217.   After the HY he was removed from the head of position, Weiss was considered for several positions at JPMorgan. (Weadock Tr. 180).

218.   After his position was eliminated, Weiss pursued positions on the syndicate desk, where he would allocate bonds, and a position in hedge fund client management. (Weadock Tr. 187).

219.   Hernandez allowed Weiss to stay on the JPMorgan payroll for three extra months while he interviewed for other positions within the firm.

220.   Both positions required significant client face time. (Weadock Tr. 226).

221.   Weadock did not recommend Weiss for either position because he could not see Weiss in a client facing role.

222.   Since May 2006 Plaintiff has been employed as an executive vice president by Cheslock, Bakker & Associates. (Pl. Tr. 14).

223.   Cheslock, Bakker & Associates manages real estate properties and institutional funds. (Pl. Tr. 14).


**HY SALES CONFERENCE**

224.   Weiss alleges that in late January 2005, at a sales conference with clients in Miami, James Lee, a Vice-Chairman for JPMorgan stated during a speech that Weiss was the best in the world at what he does. (Complaint).

225.   Lee, a Vice-Chairman in the JPMorgan investment bank is responsible for working with JPMorgan's major clients on major transactions and his duties chiefly involve talking with various CEOs to develop business. (Lee Tr. 5, 8).

226.   Lee, has been in his Vice-Chairman position for about five to six years. (Lee Tr. 8).

227.   Lee, had very little interaction with Weiss between 2000 and his termination in March 2005. (Pl. Tr. 82-84, Lee Tr. 43).

228.   Lee who managerial authority over Weiss, had no personal knowledge of how Weiss was performing as manager in HY sales. (Lee Tr. 43).

**PROCEDURAL HISTORY**

229.   On or about September 2, 2005, Plaintiff filed a Charge of Discrimination with the EEOC. (Sowell Aff. ¶15; Sowell Aff. Exhibit L).

230.   On March 17, 2006 the EEOC issued a Notice of Right to Sue to Weiss. (Sowell Aff. ¶16; Sowell Aff. Exhibit M))

231.   On June 12, 2006, Weiss filed a Complaint and Jury Demand alleging causes of action under the Age Discrimination in Employment Act and New York City Human Rights Law. (Complaint ¶ 26-35; Sowell Aff. Exhibit N).

232.   During his employment, Plaintiff never complained to anyone at JPMorgan that he had been discriminated against on account of his age. (Pl. Tr. 79-80).

**HEADCOUNT OF HY SALES TEAM BETWEEN JANUARY 2004 AND APRIL 2005**

233.   As of January 2004, including Weiss, the HY team consisted of 18 individuals, including 4 Managing Directors (Weiss, Michael Cherry, Anthony McCann and Jeff Warren ) 8 senior level Vice-Presidents Shabbir Jasdanwala, Scott Donohue, Edward Dugan,  Joshua Neren, Brian Charters, Christopher Boege, Peter Wade and Gene Pagnozzi, 1 junior level Vice-

President, Laura Yachimski and 5 lower level employees who were associates, analysts or assistants. (Flug Tr. Exhibit 7).

234.    As of January 2005, Weiss HY team consisted of 18 individuals, including 2 Managing Directors (Weiss and  McCann) 8 senior level Vice-Presidents (Shabbir Jasdanwala, Scott Donohue, Edward Dugan, Joshua Neren, Brian Charters, Gene Pagnozzi, Christopher Boege Peter Wade, and internal transfer Stephanie Garland), 1 junior level Vice-President, Yachimski and 6 lower level employees who were associates, analysts or assistants. (Flug Tr. Exhibit 34)

235.    As of April 2006, the HY consisted of 16 individuals 1 Managing Director (McCann), 8 senior level Vice-Presidents (Edward Dugan, Joshua Neren, Brian Charters, Gene Pagnozzi, Christopher Boege, Peter Wade, Stephanie Garland and internal transfer Stephen Selver) and 1 junior level Vice-President, Yachimski and 6 lower level employees who were associates, analysts or assistants. (Flug Tr. Exhibit 34; See footnotes supra).

236.    Weadock believed that based on Weiss's team going over Weiss's head to Flug to voice their concerns regarding compensation showed they did not trust that Weiss could or would deliver the compensation message to Flug and felt this showed a loss of faith and thrust in Weiss. (Weadock 2nd Tr. 57).


**MISCELLANEOUS**

238.    In March 2005, Van Niel, sent an e-mail to Audrey Brahms, a Human Resource business partner indicating that a decision had been made to terminate the employment of Weiss for reasons that included the fact that Weiss was a non-producing manager, not himself cover and the

business wanted to move toward a "Producer-Manager model" where the manager also had responsibility for covering High Yield Sales accounts. (Brahms Aff. ¶¶ 6 -7).

239.    JPMorgan's policy for processing job eliminations which requires Human Resources personnel to generate a report which includes demographic data (i.e., sex, race and age) for all employees in the group from in which the employee(s) identified for job elimination worked. (Brahms Aff. ¶ 8).

240.    The purpose of the report is to allow Human Resources and other appropriate persons, to evaluate whether the contemplated job elimination(s) will have an adverse impact on the demographics of the affected group and to double-check that the rationale for the contemplated action is based on sound managerial judgment and legitimate business factors including, without limitation, performance, relative ranking among peers, business goals and direction, expense measures etc. (Brahms Aff. ¶ 9).

241.    The report is also required because it includes a Mail Merge Worksheet which facilitates the generation of the Notice Letter notifying affected employees of their impending job elimination and providing important information such as, for example, the termination effective date, severance pay and benefits for which they are eligible, information on Career Services, equity awards and execution of the release agreement. (Brahms Aff. ¶ 9).

242.    Consistent with JPMorgan policy for processing job eliminations, on March 11, 2005, Brahms generated a report for the HY Sales team, of which Mr. Weiss was a part.  (Brahms Aff. ¶ 11; Brahams,Aff. Exhibit C).

243.    Based on the information included in the report/Mail Merge Worksheet, a Notice Letter was generated for Mr. Weiss, dated March 15, 2005.  Brahms provided a copy of the Notice Letter to Weiss on March 15, 2005.  (Brahms Aff. ¶ 11; Brahams,Aff. Exhibit C).

244.     Carlos Hernandez was born on September 6, 1961. (Hernandez Tr.6)

245.     Josh Neren was born on October 19, 1967.  (Brahms Aff. Exhibit C)

246.     Anthony McCann was born on April 15, 1964.  (Brahms Aff. Exhibit C)


Dated:  August 24 2007
        New York, New York

By: _Stephanie E. Sowell_

**JPMorgan Chase Legal Department**
Stephanie E. Sowell, Esq. (SES 7566)
One Chase Manhattan Plaza, Floor 26
New York, New York 10081
(212) 552-0929


To:     Piper Hoffman (PH 4990)
        Outten & Golden LLP
        3 Park Avenue, 29th Floor
        New York, New York 10016
        (212) 245-1000

        Garrison, Levin-Epstein, Chimes & Richardson, P.C.
        Joseph D. Garrison (CT 04132)
        Lynda A. Rizzo (CT 25643)
        405 Orange Street
        New Haven, CT 06511
        (203) 777-4425